UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOCELYN R. DAVIS**,                                    Case Number 1:12 CV 22

      Plaintiff,                                    Judge Christopher A. Boyko

      v.                                    REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

      Defendant.                                    Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Jocelyn Davis filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI).  The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  For the reasons below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

On January 25, 2006, Plaintiff filed applications for DIB and SSI alleging a disability onset date of December 13, 2005. (Tr. 173).  Plaintiff asserts she is disabled due to a heart condition, low energy level, and lingering complications from a serious infection she suffered in late 2005 into early 2006. (Tr. 191).  Her claims were denied initially and on reconsideration. (Tr. 132, 135, 140). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 148).  The hearing took place on June 30, 2009 in Cleveland, Ohio. (Tr. 71).  Plaintiff, represented by counsel, testified

about her conditions at this hearing. (Tr. 72–78, 105–06, 110–11). Dr. Daniel Schweid, an impartial medical expert ("ME") certified in psychiatry (Tr. 78-107), and Kevin Yi, an impartial vocational expert ("VE") also testified. (Tr. 78–107; 107–22). After the hearing, Plaintiff's attorney submitted additional medical evidence, the VE submitted written answers to ALJ's Interrogatories, and Plaintiff's attorney commented on the Interrogatories. (Tr. 246–58, 653–57). The ALJ issued a partially favorable notice of decision, finding Plaintiff was disabled between December 13, 2005 and December 31, 2006, but not disabled for all subsequent dates. (Tr. 10–41).

For the period prior to January 1, 2007, the ALJ's residual functional capacity (RFC) determination included a limitation that Plaintiff would be absent from work at least once per week because of her impairments. (Tr. 25). The ALJ determined, based on the testimony of the VE, no jobs existed in significant numbers in the national economy for a person with Plaintiff's absence limitation. (Tr. 29–30). However, the ALJ went on to find Plaintiff's medical condition improved as of January 1, 2007. (Tr. 31). The ALJ then determined Plaintiff's RFC should be revised as of that date to eliminate the limitation related to missing time from work. (Tr. 33). Based on the revised RFC and the VE's testimony, the ALJ determined Plaintiff was no longer disabled as of January 1, 2007 because there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (Tr. 38–41).

Plaintiff requested review of the ALJ's decision by the Appeals Council. The request was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff now challenges the ALJ's determination of medical improvement, contending her disability continued after January 1, 2007. (Doc. 12, at 10). In particular, Plaintiff focuses on the following three conditions, arguing they preclude a finding of improvement post-January 1, 2007:

2

left hand pain, numbness, and weakness; back/musculoskeletal pain; and shortness of breath and fatigue. (Doc. 12, at 11–13).

**FACTUAL BACKGROUND**

**General**

Plaintiff was born on October 31, 1966. (Tr. 173).  At the time of the administrative hearing she was 42 years old.  Plaintiff has a high school education and past relevant work as a childcare provider, mail carrier, hospital records clerk, and assistant manager at a candy store. (Tr. 72, 191–92).  She stopped working in August 2005 because she "really didn[']t like [her] job" and has not worked since that time. (Tr. 73, 191).  She alleges a disability onset date of December 13, 2005. (Tr. 191).

**Medical Evidence (Pre-January 1, 2007)**

Plaintiff is HIV-positive and has hidradenitis suppurativa (a chronic skin condition in which sweat gland pores become occluded causing inflamed abscesses). (Tr. 264).  On December 15, 2005, Plaintiff was hospitalized with an infection, methicillin-resistant staphylococcus aureus, commonly known as MRSA. (Tr. 264). The infection spread locally and throughout the blood, and Plaintiff developed sepsis. (Tr. 264–66). During the throes of the infection, Plaintiff suffered a heart attack and developed acute renal failure. (Tr. 264–66). The infection started near Plaintiff's armpit and moved to her thorax, left breast, abdomen, and large areas of tissue begin to die, a condition known as necrotizing fasciitis. (Tr. 264–66). Plaintiff was hospitalized from December 15, 2005 until January 10, 2006. (Tr. 264–66). During that time, she underwent several surgeries to remove the dead tissue, as well as skin grafting surgery. (Tr. 264–66). Plaintiff was discharged on January 10, 2006 to home care and physical therapy. (Tr. 265).

In June 2006, Plaintiff underwent surgery to reconstruct her left breast because breast tissue previously was removed during her hospitalization as a result of the necrotizing fasciitis. (Tr. 318–19).  On September 5, 2006, she had further surgery to complete the reconstruction of her left breast and to establish symmetry with her right breast. (Tr. 357–58).  At this time, Plaintiff also elected to have liposuction to her abdomen. (Tr. 358).

Plaintiff underwent several cardiac tests during 2006. An echocardiogram in February revealed trivial to mild abnormalities. (Tr. 427–28).  However, the results of a stress test in April 2006, a cardiac catheterization in August 2006, and holter monitoring in November 2006 were normal. (Tr. 419–26).

In August 2006, Plaintiff saw her treating physician, Dr. Mary Rabb, and complained of fatigue, tightness in connection with her left breast, and shortness of breath. (Tr. 392).  In September 2006, Plaintiff complained of headaches, dizziness, and an ache in her left breast. (Tr. 388–90).

On September 7, 2006, Dr. Eulogio Sioson performed a consultative exam ("CE") and noted Plaintiff was recovering from reconstructive surgery, was HIV-positive, but was otherwise in good physical condition. (Tr. 359–60).  Plaintiff told Dr. Sioson she would get short of breath walking around the house, climbing a flight of steps, and would tire after "standing 15 to 20 minutes and sitting for an hour." (Tr. 359).  Dr. Sioson noted Plaintiff's heart was "regular" with no significant murmur. (Tr. 360).  Dr. Sioson found her range of motion, including her left arm and hand, was normal and further found no evidence of muscle atrophy. (Tr. 362–65).  He also noted she was able to grasp and manipulate with each hand. (Tr. 360).

In October 2006, Dr. Caldwell completed an RFC assessment and found Plaintiff could lift ten pounds frequently and twenty pounds occasionally. (Tr. 369).  In addition, she could sit, stand,

4

and walk for six hours in an eight-hour day. (Tr. 369). She had no postural, manipulative, or other limitations. (Tr. 370–72). Also in October 2006, Plaintiff visited Dr. Rabb, complaining of fatigue and a weak left arm and indicating she had fainted the week prior. (Tr. 384). Dr. Rabb's notes indicated Plaintiff asked her to fill out disability application paperwork, but Dr. Rabb informed Plaintiff she must complete the documents on her own. (Tr. 384, 386).

In December 2006, Plaintiff saw Dr. Rabb once again, this time reporting shortness of breath and fatigue. (Tr. 380). Dr. Rabb determined Plaintiff's HIV was stable and her fatigue could be due to hypotension (low blood pressure), and advised Plaintiff to schedule a follow up exam for May 2007. (Tr. 382). As of December 2006, Plaintiff claimed to have been using a motorized cart for grocery shopping and reported problems washing clothes and walking up and down the stairs. (Tr. 220). She maintained that "I can't walk very long before I am out of breath." (Tr. 220).

**Medical Evidence (Post-January 1, 2007)**

In January 2007, Plaintiff filled out a form in connection with her disability application in which she stated she was unable to drive or prepare meals and she was using a walker. (Tr. 226–28). She reported beginning in February 2007, her left arm would get "completely numb". (Tr. 233).

In February 2007, Dr. Rabb completed a form in connection with Plaintiff's social security claim. (Tr. 376). Dr. Rabb reported Plaintiff had no known cognitive limitations, no known limitation on activities of daily living, and found her self care abilities were very good. (Tr. 377). Dr. Rabb did find Plaintiff was suffering from mild depression related to her HIV status and a prior bout with necrotizing fasciitis. (Tr. 377–78).

On March 6, 2007, Plaintiff went to the hospital complaining of fever, weakness, and rapid heart rate. (Tr. 443). At that time, she was diagnosed with a kidney and urinary tract infection and

hospitalized until March 9, 2007. (Tr. 85, 443–55).  Also in March 2007, Dr. Franklin Krause performed a CE and found nothing abnormal. (Tr. 456–61). The state reviewing physician noted Dr. Krause's CE "showed breathing normal at 12/min." and the "diaphragm moving well" with "excellent" air entry. (Tr. 499).

On April 3, 2007, Plaintiff underwent another mastopexy to correct breast symmetry from the prior necrotizing fasciitis. (Tr. 646).

On April 6, 2007, Dr. David House, a psychologist, performed a CE. (Tr. 462).  Dr. House reported Plaintiff had stated that she left her job as a mail carrier because "it was time to leave." (Tr. 463).  She told Dr. House she experienced daily depression, ongoing panic attacks, and had attempted suicide in 2006 by cutting her wrists. (Tr. 464).  Plaintiff also told Dr. House she suffered ongoing panic attacks and was hospitalized for a week in March 2007 as a result of a panic attack. (Tr. 464). Dr. House concluded Plaintiff did not appear to be overtly agoraphobic. (Tr. 464). Plaintiff reported that she was depressed and spent "a lot" of her time sitting and reading or watching television. (Tr. 465).  Dr. House found Plaintiff's concentration and attention were moderately limited and her insight and judgment were mildly limited. (Tr. 465–66).  He found Plaintiff's ability to understand and follow directions was not limited but she may have some difficulty following more complicated directions and her ability to withstand stress and pressure was moderately limited. (Tr. 465).  He also found Plaintiff's ability to relate to others and deal with the general public was mildly to moderately limited and concluded Plaintiff's level of adaptability was mildly limited. (Tr. 465–66).  He diagnosed Plaintiff with panic disorder without agoraphobia, as well as depressive disorder NOS and assigned her a GAF score of 50. (Tr. 466).

In May 2007, state reviewing consultant Vicki Casterline, Ph.D. completed a mental RFC

6

assessment based on a review of Plaintiff's records and found Plaintiff had some moderate limitations. (Tr. 468–69).  Dr. Casterline said Plaintiff could work in jobs that do not require strict production quotas or frequent contact with people. (Tr. 470).

A chest x-ray on May 31, 2007 was normal. (Tr. 487, 496).  A pulmonary function study completed on the same day by Dr. Sioson noted poor effort, such that results could not be interpreted. (Tr. 489–90).  State reviewing consultant Dr. Leslie Green found Plaintiff's breathing impairment only partially credible, noting "[t]here was no observation of breathing difficulties at the time of the test." (Tr. 499).

In June 2007, Plaintiff complained to Dr. Rabb of palpitations, dyspnea on exertion, and left-arm numbness. (Tr. 634).  Dr. Rabb noted fatigue, palpitations of unknown cause, and left-arm numbness of unknown cause, diagnosed HIV, and ordered an echocardiogram, holter monitoring, and follow up in three months. (Tr. 635–36).  The subsequent echocardiogram was normal. (Tr. 643, 83).

In August 2007, Plaintiff saw Dr. Rabb and complained of left-arm pain, chest pain, and shortness of breath. (Tr. 630–33). Plaintiff also underwent a pulmonary function test. (Tr. 642).  The results indicated Plaintiff had a very mild restriction and moderate to severe obstruction. (Tr. 642).  The report did not indicate whether Plaintiff was asthmatic, i.e., that the condition was reversible, or whether this was a chronic obstructive problem. (Tr. 83).

On January 18, 2008, Plaintiff saw a clinic doctor and complained of chest pain. (Tr. 626).  The doctor deferred to Plaintiff's treating physician to investigate a non-cardiac cause of the chest pain. (Tr. 628).  A week later, Plaintiff saw a clinic doctor and complained of headaches, pain in her left shoulder, and shortness of breath. (Tr. 622).

In February 2008, Plaintiff saw Dr. James Finigan at University Hospitals and complained of shortness of breath and headaches. (Tr. 514).  Plaintiff reported she used to smoke but quit in 2005 and had a history of snorting cocaine and smoking marijuana, which she also had not done since 2005. (Tr. 514).  Dr. Finigan administered a pulmonary function test, and her performance was close to normal. (Tr. 515).  However, Dr. Finigan said he could not rule out the possibility of asthma and prescribed Plaintiff Advair. (Tr. 515).

In March 2008, Plaintiff underwent another echocardiogram. (Tr. 507).  The test revealed no obstruction and Plaintiff's heart was functioning normally. (Tr. 508).  The estimated ejection fraction for Plaintiff's left ventricle was 55–60 percent. (Tr. 508).  The test did reveal some evidence of mild pulmonary hypertension, mildly dilated right ventricle, and mild tricuspid regurgitation. (Tr. 509).

On March 26, 2008 Plaintiff visited the clinic and reported she woke up with a headache and had shortness of breath. (Tr. 618).  The doctor scheduled Plaintiff for a follow up in two months. (Tr. 620).The next day, Plaintiff saw neurologist Dr. Tina Blitz at University Hospitals, complaining of headaches, vertigo, and intermittent numbness in her left arm. (Tr. 590–91).  Plaintiff told Dr. Blitz she had been having headaches since her mid-20s but they had worsened during the last two years. (Tr. 590).  She told Dr. Blitz she experienced headaches four days out of every seven. (Tr. 590). Dr. Blitz found Plaintiff had normal strength in all her limbs, but some diminished sensation to pinprick in her left thumb and index finger. (Tr. 592).  Dr. Blitz started Plaintiff on Neurontin and planned to obtain an MRI of her brain. (Tr. 593).

In May 2008, Plaintiff went to University Hospitals emergency room complaining of headaches and chills. (Tr. 502).  She was admitted at that time to rule out the possibility of

8

meningitis. (Tr. 502).  She reported the pain started from her neck and extended to her face bilaterrally, but was nonthrobbing. (Tr. 502). Plaintiff also reported headache episodes associated with left arm weakness. (Tr. 502). She was diagnosed with a migraine and a urinary tract infection and released after three days. (Tr. 503).

Plaintiff returned to University Hospitals on June 4, 2008, complaining of chest wall pain on her left side. (Tr. 501).  Plaintiff's plastic surgeon, Dr. Ganz, suspected Plaintiff had a neuroma (a painful lump) in connection with her breast reconstruction after her necrotizing fasciitis and planned an excision of the neuroma as well as a revision mastopexy to the right breast. (Tr. 501). Plaintiff had this surgery on June 24, 2008. (Tr. 577).

Plaintiff was hospitalized from August 26–28, 2008 for vaginal bleeding. (Tr. 565).  An ultrasound revealed a large uterine fibroid. (Tr. 565–67).  At that time, Plaintiff received a blood transfusion. (Tr. 565).

In December 2008, Plaintiff told a clinic doctor she was suffering from a headache.  (Tr. 616).  The doctor noted Plaintiff's history of migraines, controlled asthma, and stable coronary artery disease, and scheduled a follow up for March 2009. (Tr. 616).  On March 6, 2009, Plaintiff reported atypical chest pain and palpitations to the clinic doctor. (Tr. 610).

On March 11, 2009, Plaintiff went to the emergency department, once again for vaginal bleeding. (Tr. 583). An exam showed that her strength was normal in her upper and lower extremities. (Tr. 583). She was diagnosed with anemia and hypotension and was administered fluids. (Tr. 583). Plaintiff had a third echocardiogram that month, and the results showed normal function, suggesting any pulmonary hypertension evidenced in the March 2008 echocardiogram was gone. (Tr. 639, 83).  In April 2008, she reported palpitations and shortness of breath and underwent a

9

24-hour holter monitoring. (Tr.602–05, 641). The results showed no significant arrhythmias and normal sinus rhythm. (Tr. 598).

On May 5, 2009, Plaintiff reported to her clinic doctor she was still having palpitations, although the doctor noted the results of the recent holter testing showing no arrhythmia. (Tr. 598, 601). At that time, the doctor noted Plaintiff's depression, with panic attacks as a possible cause of the palpitations. (Tr. 601). On June 15, 2009, a clinic doctor noted shortness of breath, dyspnea on exertion, chest pain, palpitations, musculoskeletal pain, and fatigue. (Tr. 597).

David Edelstein,[1] an occupational therapist, assessed Plaintiff's RFC in July 2009. (Tr. 654–56). Mr. Edelstein found Plaintiff could lift ten pounds occasionally and less than ten pounds frequently. (Tr. 654–56). She could stand and walk for two hours in an eight-hour day and sit for six hours and could sit only for one hour at a time before changing position and stand ten minutes before changing position. (Tr. 654–56). Mr. Edelstein also said Plaintiff must walk around for five minutes every hour and must be able to sit/stand at will. (Tr. 654–56). Mr. Edelstein noted "prolonged sitting, standing, or walking [would] exacerbate [Plaintiff's] low back pain". (Tr. 655). He stated he could not say how often she would be absent from work without specifying the type of work. (Tr. 656).

**Hearing Testimony**

Plaintiff testified she believed she was disabled because of the December 2005 MRSA infection with necrotizing facitiis, pain in her legs, shortness of breath, back problems, panic attacks, depression, weakness in her left leg, generalized weakness, migraine headaches, HIV, kidney

---

1. The ALJ references a "Mr. Gogistew". (Tr. 35). It appears ALJ had difficulty deciphering Mr. Edelstein's handwriting. (Tr. 656–57).

failure, and numbness on the left side of her body. (Tr. 73–76).

The ME provided a summary of Plaintiff's medical records.  He then testified Plaintiff had the following severe impairments: hidradenitis suppurativa (resulting in necrotizing fasciitis and severe complications); pulmonary disease; HIV; depression; anxiety; and panic disorder without agoraphobia. (Tr. 87–91).  The ME opined none of Plaintiff's impairments met the criteria of a listed impairment. (Tr. 94–96).  He testified that while Plaintiff suffered a significant event (the MRSA infection and necrotizing fasciitis) in December 2005 limiting her functional capacity, she would have experienced improvement by about a year later. (Tr. 98).

The ALJ questioned the ME about Plaintiff's alleged back pain, and the ME testified there was no evidence of a spinal impairment. (Tr. 99). When questioned about fatigue, the ME acknowledged fatigue would lower a person's ability to lift, carry, walk, stand, and sit. (Tr. 102). He testified Plaintiff's left-sided numbness was more than likely tied to scarring from her prior surgeries, but there was no evidence in the record of major nerve function impairment or other impairment to her left hand that would impact handling or fingering abilities. (Tr. 104).  When questioned by the ALJ, Plaintiff testified, "I have problems holding things, I drop a lot of things. I fall a lot.  I have trouble pushing a car at the grocery store." (Tr. 106).

The ALJ asked the VE five hypothetical questions, focusing on sedentary work, in low-stress jobs.  The first two hypotheticals were predicated on back impairments.  The first hypothetical required Plaintiff to change position from sitting to either standing or walking or from standing or walking to sitting at least every 15 or 30 minutes, and the VE testified no jobs would be available without an employer accommodation. (Tr. 113–16).  The second hypothetical assumed Plaintiff could stand and walk up to 15 minutes at a time without a break from standing or walking and could

11

sit up to 30 minutes at a time without a break from sitting. (Tr. 116).  The VE also concluded no jobs would be available without an employer accommodation. (Tr. 116–17). The third hypothetical assumed Plaintiff could sit at least 45 minutes at a time. (Tr. 118). The VE testified Plaintiff could do such jobs as business address clerk, electronic assembly inspector, and film touch up inspector. (Tr. 119–20). The fourth hypothetical assumed Plaintiff could only occasionally use her left upper extremity for handling.  The VE testified there would be no jobs without an employer accommodation. (Tr. 121).  The fifth hypothetical assumed Plaintiff would be absent once each week.  The VE said there would be no available jobs in that situation. (Tr. 122).

**The ALJ's Decision**

At Step One of the sequential analysis, the ALJ determined Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 13, 2005. (Tr. 19).  At Step Two, he found that Plaintiff had the severe impairments of hidradentitis in the armpits resulting in necrotizing fasciitis and complications; HIV infection; chronic obstructive pulmonary disease (COPD); depression; anxiety; and panic disorder without agoraphobia. (Tr. 19–20).  The ALJ also found Plaintiff had the following non-severe impairments: vaginal bleeding secondary to fibroid uterus and headaches. (Tr. 21). The ALJ determined at Step Three Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1.  The ALJ then determined Plaintiff's RFC for the period of December 15, 2005 through December 31, 2006, which included the limitation that Plaintiff "would have been absent from work at least once per week because of her impairments." (Tr. 25).  The ALJ determined Plaintiff was disabled from December 15, 2005 through December 31, 2006 because she was unable to perform past relevant work and no jobs

existed in significant numbers in the regional or national economy given her RFC during that time.
(Tr. 29). However, the ALJ determined Plaintiff experienced medical improvement as of January
1, 2007, such that she was no longer disabled. (Tr. 29–30). In light of the medical improvement, the
ALJ concluded Plaintiff's severe impairments no longer required her to be absent from work at least
one day each week.

STANDARD FOR DISABILITY

**Initial Disability Determination**

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)
& 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less than 12
months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows
a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a
claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination
   of impairments, that is "severe," which is defined as one which substantially
   limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform
   past relevant work?

5. Can claimant do any other work considering her residual functional capacity,
   age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

13

through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f) & 416.920(b)–(f).

**Cessation of Benefits**

When, as here, a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007). Whether an individual's entitlement to benefits continues depends on whether "there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." 20 C.F.R. §§ 404.1594(b) & 416.994(b).

The cessation evaluation process is a two-part process. *See Kennedy*, 247 F. App'x at 764–65. The first part of the process focuses on medical improvement. *Id.* at 764. The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." *Id.* at 764–65 (citing 20 C.F.R. § 404.1594(b)(1)). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairments . . . ." 20 C.F.R. §§ 404.1594(b)(1)(i) & 416.994(b)(1)(i). If there

14

has been a decrease in the severity of the impairments, "the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities . . . .'" *Kennedy*, 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(3)); *see also Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 361 (9th Cir. 2001).

The second part of the cessation analysis focuses on whether the claimant has the ability to engage in substantial gainful activity. *Kennedy*, 247 F. App'x at 765. The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations governing the initial disability determinations. *Id.* (citing 20 C.F.R. §§ 404.1594(b)(5) & (f)(7)). The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citing 20 C.F.R. §§ 404.1594(b)(5) & (f)(7)). An increase in the claimant's RFC will lead to a cessation of benefits only if, as a result, the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1594(f)(8) & 416.994(f)(8).

To determine whether entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(f)(1)-(8). *Kennedy,* 247 F. App'x at 764. The steps are:

1.      Are you engaging in substantial gainful activity? If you are . . . we will find disability to have ended . . . .

2.      If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

3.      If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section?

4.      If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)

15

through (4) of this section.

5. If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply.

6. If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe.

7. If your impairment(s) is severe, . . . we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past.  If you can do such work, disability will be found to have ended.

8. If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment . . . .  If you can, we will find that your disability has ended.  If you cannot, we will find that your disability continues.

20 C.F.R. §§ 404.1594(f) & 416.994(f).  There is no presumption of continuing disability.  *Kennedy,* 247 F. App'x at 764 (citing *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286–87 n.1 (6th Cir.1994)).  Instead, the Commissioner applies the above procedures to determine whether the claimant's disability has ended and if she is now able to work.  *Id.*

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Walters*, 127 F.3d at 528.  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Secy's of Health & Human Servs.*, 966 F.2d 1028, 1030

16

(6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**DISCUSSION**

Plaintiff raises a single alleged error:

The ALJ's finding of medical improvement beginning January 1, 2007 is not supported by the substantial evidence.

(Doc. 12 at 1).  Specifically, Plaintiff argues the ALJ's finding of medical improvement cannot be sustained because the ALJ did not acknowledge or give proper weight to evidence of:

- Plaintiff's left-arm pain/numbness;

- Plaintiff's back pain; and

- Plaintiff's shortness of breath and fatigue.

**Plaintiff's Left-Arm Pain/Numbness**

In his decision, the ALJ stated:

In a Disability Report – Appeal (Exhibit 11E) that she submitted to the Social Security Administration, Ms. Davis alleged that since February 2007, her left arm "keeps going completely numb and limp."  However, I found no medical evidence in the record that this condition was ever examined, diagnosed, or treated.

(Tr. 32).  Plaintiff points to instances in the record where she complained of left arm numbness and contends the ALJ erred when he found no medical evidence in the record supporting Plaintiff's left arm pain.  This argument is irrelevant to the question of whether substantial evidence supports the

17

ALJ's determination that her condition improved as of January 1, 2007 because Plaintiff herself reported that the first instance of symptoms was February 2007 (Tr. 233).[2] *See Frazier v. Astrue*, 2012 WL 6631388, at *12 (N.D. Ohio Dec. 3, 2012), report and recommendation adopted, 2012 WL 6631231 (N.D. Ohio Dec. 19, 2012) (plaintiff's argument that she suffered from fibromyalgia was "irrelevant to the question whether substantial evidence supports the ALJ's determination that her condition improved as of October 1, 2008, because it indicates that the first instance of symptoms consistent with fibromyalgia was on June 16, 2009, some eight and one half months later"). In any event, the ALJ found that both before and after January 1, 2007, Plaintiff could use her left arm to reach overhead, push, and pull occasionally (Tr. 25, 33). Thus, the ALJ never found medical improvement with respect to limited use of Plaintiff's left arm.

Additionally, substantial evidence supports a conclusion this alleged new impairment did not significantly affect Plaintiff's RFC. In June 2007, Plaintiff told Dr. Rabb she was experiencing left-arm numbness. (Tr. 634). There is no indication Dr. Rabb performed any testing on Plaintiff's left arm or otherwise examined or studied the condition; she simply noted Plaintiff's complaint. In August 2007, Plaintiff saw Dr. Rabb again and complained of left-arm pain. (Tr. 630–33). Once again, there is no indication of a diagnosis or treatment related to the left arm. Dr. Blitz examined Plaintiff in connection with her persistent headaches on March 27, 2008 (Tr. 590). Dr. Blitz noted Plaintiff also reported a " history of intermittent numbness in the left arm. This numbness occurs 4–5 times per week and generally lasts 4–5 seconds". (Tr. 591). Dr. Blitz concluded Plaintiff had "5/5 strength" as to all limbs and normal motor tone. (Tr. 592). Dr. Blitz did note Plaintiff "has

---

2. While the record indicates Plaintiff complained of fatigue and a weak left arm weakness in October 2006 (Tr. 384), Plaintiff's social security application indicates the condition did not become prevalent and disabling until February 2007 (Tr. 233).

diminished sensation to pinprick in the left thumb and index finger.  Pinprick sensation is otherwise intact". (Tr. 592).

The ME testified Plaintiff's left-sided numbness was more than likely tied to scarring from her prior surgeries, but there is no evidence in the record of major nerve function impairment or other impairment to her left hand that would impact handling or fingering abilities. (Tr. 104). Therefore, substantial evidence exists to support a conclusion that, even if Plaintiff had received a formal diagnosis related to her alleged left-arm pain and numbness, the symptoms were not so severe as to have an effect on Plaintiff's post-January 1, 2007 RFC.

**Plaintiff's Back/Musculoskeletal Pain**

Plaintiff next argues the ALJ's determination is not supported by substantial evidence because the ALJ, during his assessment of Plaintiff's RFC starting January 1, 2007, improperly discredited Plaintiff's credibility regarding complaints related to her back pain.  The ALJ stated:

> [Plaintiff] has alleged some kind of musculoskeletal impairment in her back or spine. However, I found no medical evidence in the record that any such condition was ever examined, diagnosed, or treated.

(Tr. 34).  Plaintiff directs the Court to portions of the record where clinic doctors note Plaintiff's complaints of back pain. In April 2009, a clinic doctor noted Plaintiff's complaint of musculoskeletal pain/ache from the "left scapular area" and diagnosed Plaintiff with myofascial back pain. (Tr. 607–08).  In June 2009, a clinic doctor noted Plaintiff's complaint of musculoskeletal pain/ache by circling the words "pain(ache)". (Tr. 597).  Plaintiff argues that because her primary care was "substantially limited to a clinic setting," documentation of all of "her whole array of problems may not have been as complete as it could have been." (Doc. 12, at 12).  Plaintiff contends "the ALJ's finding of medical improvement to the extent it relied on reduced credibility regarding

19

Plaintiff's back pain, lacked the support of substantial evidence." (Doc. 12, at 12).

However, the ALJ did not rely on the reduced credibility finding with regard to Plaintiff's back pain to support his determination of medical improvement.  Rather, he analyzed it in conjunction with his post-January 1, 2007 RFC finding. (Tr. 34).  Again, this argument is irrelevant to the question of whether substantial evidence supports the ALJ's determination that her condition improved as of January 1, 2007 because Plaintiff reported that the first instance of back pain symptoms was April 2009 (Tr. 607–08). *See Frazier*, 2012 WL 6631388, at *12. In any event, the ALJ found that both before and after January 1, 2007, Plaintiff: could stand and walk a combined total of up to and no more than one hour at a time without taking a break from these activities, and up to and no more than a combined total of two hours per 8-hour workday; could sit a total of up to and no more than one hour at a time without taking a break from sitting, and up to and no more than a total of six hours per 8-hour workday; could bend, stoop, crouch, and squat up to and no more than occasionally; and could not kneel or crawl (Tr. 25, 33).  Thus, the ALJ never found medical improvement with respect to Plaintiff's back pain.

To the extent Plaintiff is arguing substantial evidence does not support the ALJ's credibility determination, that argument is also unsuccessful.  A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Id.* at 476 (citations omitted).  On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing

20

a witness's demeanor while testifying." *Id.* (citation omitted).  Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *2.    In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

Here, the only reference in the record to back pain is noting a couple of complaints by Plaintiff in 2009. (Tr. 608–09, 597). The ME testified no medical records indicate a back problem. (Tr. 99).  There is no objective medical evidence in the record supporting Plaintiff's subjective complaint, and substantial evidence in the record supports that conclusion.

**Plaintiff's Shortness of Breath and Fatigue**

Finally, Plaintiff argues the ALJ's finding of medical improvement is not supported by substantial evidence because it failed to account for evidence of Plaintiff's shortness of breath and fatigue (Doc. 12 at 12–13).

In finding medical improvement, the ALJ noted "[t]here is no evidence in the record that on or after January 1, 2007, [Plaintiff] had necrotizing fasciitis, sepsis, heart disease, respiratory failure, renal failure, or any need for debridement of dead skin or skin grafts" (Tr. 31).  The ALJ, citing the results of heart testing, also found Plaintiff's heart condition stabilized on or after January 1, 2007 (Tr. 31–32).  Once again, it does not appear the ALJ found medical improvement with regard do shortness of breath and fatigue.  Thus Plaintiff's argument on this point is once again misplaced.

To the extent Plaintiff argues the ALJ's post-January 1, 2007 RFC was incorrect for not accounting for shortness of breath and fatigue, that argument also is not well-taken. The ALJ found that Plaintiff continued to suffer from the serious impairments of COPD and HIV infection, in addition to other impairments, after January 1, 2007 (Tr. 32). Thus, the ALJ accounted for shortness of breath and fatigue associated with these two impairments. The RFC limited Plaintiff to sedentary, non-production quota work.

While the record demonstrates Plaintiff repeatedly complained of shortness of breath, nothing in the record demonstrates these complaints prevented her from working. A May 31, 2007 chest x-ray showed nothing abnormal. (Tr. 487). A pulmonary function study completed on the same day by Dr. Sioson noted poor effort such that results could not be interpreted. (Tr. 489–90). State reviewing consultant Dr. Leslie Green found Plaintiff's breathing impairment only partially credible, noting "[t]here was no observation of breathing difficulties at the time of the test" (Tr. 499). In August 2007, Plaintiff underwent another pulmonary function test, and at that time the results showed a very mild restriction and moderate to severe obstruction. (Tr. 642). The report did not indicate whether Plaintiff was asthmatic, i.e., that the condition was reversible, or whether this was a chronic obstructive problem. (Tr. 83). A third pulmonary function test administered in February 2008 by Dr. Finigan returned largely normal results, although Dr. Finigan was unable to rule out the possibility of asthma and prescribed Plaintiff Advair. (Tr. 515).

With regard to fatigue, the ME testified fatigue often accompanies HIV, but he could not quantify the amount of fatigue. (Tr. 90, 106–07). Fatigue did not appear to be a problem during Plaintiff's holter monitoring in November 2006 and April 2008, as the results for both were normal. (Tr. 419–26, 635–36). Further, "an ALJ is not required to accept a claimant's subjective complaints

22

and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476.

Plaintiff cites to Dr. Edelstein's report in which he concluded Plaintiff had mild shortness of breath during repetitive lifting. (Tr. 655).  However, Plaintiff does not explain how such a finding renders her unable to work.  In short, Plaintiff failed to direct the Court to record evidence suggesting the ALJ's post-January 1, 2007 RFC did not properly account for Plaintiff's shortness of breath or fatigue.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB benefits after December 31, 2006 supported by substantial evidence.  The undersigned therefore recommends the Commissioner's decision be affirmed.

                            \_\_\_\_\_s/James R. Knepp, II\_\_\_\_\_
                            United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).